60 N.J. Super. 53 (1960)
158 A.2d 359
HOWARD CROSS, PLAINTIFF-RESPONDENT,
v.
ROBERT E. LAMB, INC., A CORPORATION, DEFENDANT AND THIRD-PARTY PLAINTIFF-APPELLANT,
v.
TRUSKEY INDUSTRIAL PIPE FITTERS, INC., A CORPORATION, THIRD-PARTY DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 16, 1959.
Decided February 23, 1960.
*59 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. Sidney M. Schreiber argued the cause for defendant and third-party plaintiff-appellant (Messrs. Schreiber, Lancaster & Demos and Mr. John W. Hayden, Jr., attorneys).
Mr. Horace G. Brown argued the cause for plaintiff-respondent (Messrs. Brown, Connery, Kulp & Wille and Mr. Joseph H. Rodriguez, attorneys).
Mr. Peter J. Devine, Jr., argued the cause for third-party defendant-respondent (Messrs. Kisselman, Devine & Deighan, attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
Plaintiff Cross was a pipe fitter-welder employed by the third-party defendant Truskey Industrial Pipe Fitters, Inc. ("Truskey," hereinafter), in connection with the latter's subcontract to install plumbing and heating equipment in a large, four-story building being erected in Camden for the Campbell Soup Company. The general contractor on the project was the defendant, also third-party plaintiff, Robert E. Lamb, Inc. ("Lamb," hereinafter). Plaintiff's right hand, mainly the three middle fingers, was severely and permanently injured when a heavy length of iron pipe fell on it as he was bringing it into the *60 building as it hung suspended from an outdoor hoist being operated by an employee of Lamb. He brought this action against Lamb for his injuries and consequent losses, and Lamb filed a third-party complaint against Truskey, invoking an indemnification agreement entered into between them as part of the subcontract.
The jury returned a verdict of $110,000 in favor of the plaintiff against Lamb. It also answered special interrogatories submitted to it by the court to be answered in connection with the third-party complaint should it find a verdict for plaintiff against Lamb. It answered in the affirmative the question whether there was negligence by Lamb through its agents and employees which proximately caused plaintiff's injuries; and in the negative a similar question as to Truskey's negligence. Thereupon the court granted Truskey's motion for dismissal of the third-party claim. On a motion for a new trial by Lamb the court reduced the verdict to $80,000, ascribing its action to the probable failure of the original verdict to reflect the factor of the capitalized present value of plaintiff's loss of future earnings.
Lamb appeals, raising a number of points both in respect of its adjudicated liability to the plaintiff (emphasizing errors affecting the amount of the verdict) and the dismissal of its claim over against Truskey. We proceed to a recital of the general circumstances attending the accident.
Lamb had obtained and was using a hoist device, stationed alongside the building under construction, to bring building materials and supplies to various floors of the structure. The apparatus was operated by a Lamb employee, West. While used primarily by Lamb for its own operations, it was available for the use of subcontractors at a fixed scale of charges, but only under West's operation. The hoist functioned in two ways: (a) through a conventional elevator-cage inside the steel hoist structure; and (b) by a cable and hook suspended over the top of the hoist structure and thence over an outrigger or "Chicago boom" attached to the structure about one-third below the top. A heavy metal ball was *61 attached to the cable a short distance above the hook. Both the elevator and the Chicago boom cable were raised and lowered by a winch-hoist powered by a gasoline motor on the ground nearby, equipped with foot-brakes and "dogs" for holding either lifting apparatus in fixed position in the course of use. All of this apparatus was controlled, maintained, and operated exclusively by West. While its vertical position was fixed, the Chicago boom could be swung laterally in either direction from the ground by a "tag-line" attached to the cable.
On July 29, 1957 plaintiff and three fellow-employees of Truskey were engaged, in cooperation with West, in the raising of a 4-inch, 20-foot iron pipe, weighing 275-300 pounds, from the ground up to and through a fourth-floor window-opening in the building under erection. As had been done before, the pipe was to be raised with the cable and Chicago boom. The Truskey men attached the pipe to the hook by means of a "choker," or sling device, one loop of which was affixed tightly around the pipe at about five feet "off center" and the other loop suspended from the hook. Peterson, a Truskey employee waiting with plaintiff on the fourth floor to receive the pipe and bring it into the building, signalled to Fletcher, another Truskey man, standing on the ground, who relayed the signals to West. West could not see above the second floor. The first signal was to raise the cable. West lifted the pipe too high above the window, then lowered it on signal, but below the window level, and then, again on signal, raised it slowly to a point where the bottom end hung 12 to 18 inches above the sill, and about six to ten feet from the building wall, stopping there on Peterson's signal relayed by Fletcher. The Chicago boom was then swung laterally toward the building by Groomes, another Truskey man on the ground, using the tag-line under the direction of Fletcher. By pulling on the line Groomes was able to maneuver the hanging pipe to a point near enough to the window to be handled by plaintiff. At that stage, West, according to his testimony, was waiting *62 for another signal to slowly lower the pipe so that it could be brought all the way into the building. The signal never came. After he "held the load" for what seemed to him 15 or 20 minutes (at another point he said five or six minutes), without moving the cable, he learned of the accident. He denied that he had dropped or "slacked off" the cable. Plaintiff testified he had gotten hold of the pipe to bring it in, his right gloved hand around the end of it, and brought it to the window sill, when "the whole load comes down * * * the pipe load and all," mashing his hand and fingers against the sill. Peterson described the occurrence: "all of a sudden everything came down * * *. The cable, the ball and the choker * * * everything was hanging inside the building." The choker was still attached to the hook, but had slid halfway down the pipe. Fletcher testified that before he could give the intended last signal for a lowering of the cable, the pipe and cable "all of a sudden" came down, the pipe "glanced" and in "hitting" the wall loosened the choker. When he ran up the stairs to help Peterson, he saw the ball (weight) inside the wall and below the sill. Groomes testified that he was pulling tightly on the tag-line to keep the pipe near the building in a position to be taken in when the cable and line "let loose and I went off balance."
There was testimony, undenied, that immediately before the accident the ball and hook of the cable were between the top of the window and the roof; and that immediately after, they were inside the building below the lower sill of the window. These facts, together with all the other surrounding circumstances, make the conclusion almost irresistible that the descent of the pipe causing plaintiff's injury was due to a sudden dropping or slipping of the cable for a distance of at least several feet.

I.
Lamb contends there was plain error when the trial court charged the jury as follows:
*63 "The third affirmative defense asserted by the defendant Lamb is that this accident and the resulting injury was proximately caused by the negligence of the Truskey Company through its employees. In determining this question, you are to apply the same legal definitions and principles as heretofore stated. The burden is likewise upon the defendant Lamb to support this defense by the greater weight of the believable testimony. If the defendant Lamb has satisfied you that this contention is true by the greater weight of the evidence, then there can be no recovery by the plaintiff, and your verdict should be `no cause for action.' Please keep in mind, that the question of Truskey's negligence, if any, is raised by Lamb only as a defense to the action brought by the plaintiff against the Lamb Company. In no event can you return a verdict against Truskey on the plaintiff's suit, since Truskey is not a defendant therein. Your only verdict in this case can be either for the plaintiff and against the defendant Lamb Company, or for the Lamb Company and against the plaintiff. The only one that the plaintiff can recover against is the defendant Lamb, if he has established by the preponderance of the evidence that this accident resulted either from the sole negligence of Lamb, or from the joint and concurrent negligence of Lamb and Truskey, and that such sole, or concurrent, or joint negligence was the proximate cause of the accident and injuries." (Emphasis ours)
The stress of the objection is the imposition upon Lamb of the burden of proving that the accident was caused by the negligence of Truskey. There was no objection to this portion of the charge, but defendant asserts the claimed error was so serious and prejudicial as to require a reversal of the verdict on liability on the theory of "plain error." R.R. 1:5-3(c). It is clear that the portion of the charge specified was technically erroneous, since the burden of proof, or ultimate persuasion of the jury, as to defendant's negligence and its causal proximity to the injurious accident always remains with the plaintiff, including consideration of the factor, if raised by the proofs, as to whether the accident was produced solely by the negligence of another. Cella v. Roth, 113 N.J.L. 458 (E. & A. 1934). Actually, the matter of the responsibility of one other than the defendant is "not really one of separate defense," but within the scope of a general denial, ibid. (at page 463), and the trial court was probably misled into the giving of the instruction now *64 complained of by Lamb's setting up of Truskey's negligence as a separate defense in its answer.
The rule of plain error is sparingly applied, Valls v. Paramus Bathing Beach, Inc., 46 N.J. Super. 353, 358 (App. Div. 1957), and only where it is clear that the erroneous action has produced a failure of substantial justice, In re Stern, 11 N.J. 584, 590 (1953); Ford v. Reichert, 23 N.J. 429 (1957). We do not think this has been shown here. First, the trial court in other portions of the charge painstakingly explained that in order for the plaintiff to recover he had the burden of satisfying the jury by the greater weight of the believable testimony that there was negligence on the part of Lamb and that such negligence was the proximate cause of the injuries sustained. "Proximate cause" was adequately explained. In specific reference to the subject matter under discussion, the charge informed the jury that:
"The only one that the plaintiff can recover against is the defendant Lamb, if he has established by the preponderance of the evidence that this accident resulted from the sole negligence of Lamb, or from the joint and concurrent negligence of Lamb and Truskey and that such sole, or concurrent, or joint negligence was the proximate cause of the accident and injuries."
The jury was thus, in effect, told that unless plaintiff satisfied them that Lamb was either solely or partially responsible, proximately, for the accident, he could not recover. This would, of course, require him to negative by his proofs the contingency that Truskey's negligence, if any, was solely responsible. Such a conclusion was hardly, if at all, possible by any reasonable evaluation of the proofs. The accident happened because the cable fell, dropping the pipe with it. No evidence in the case indicates that any of Truskey's men could have been responsible for that. None of the proofs fairly warranted an inference that the pipe was not firmly attached to the cable, or that the giving of the signals or the maneuvering of the tag-line caused the sudden descent of the cable. While it is possible, but barely, that some act *65 or default of one of the Truskey men contributed in some way to the plaintiff's injury, this does not derogate from the overwhelmingly established thesis that a major share of the fault for the accident and injury, at the least, was ascribable to defects in the machine or the negligence of the operator, both of such factors within the legal responsibility of Lamb as maintainer and employer. (Lamb has not suggested at any time that the accident was caused by a defect in the machinery; its position has been, alternatively, that the accident was due solely to the negligence of the Truskey employees or that West's negligence, if any, was attributable to Truskey as his special employer because in control of his work while the pipe was being raised; as to the latter, see II., infra.)
It thus appearing that negligence attributable legally to Lamb must have played a substantial causative role in the accident, and since Lamb's liability to plaintiff therefor would not be lessened by the contribution, if any, of negligence by Truskey men to the accident, no failure of substantial justice can have arisen from the court's erroneous charge that Lamb had the burden of showing that the accident was solely the fault of Truskey.

II.
Defendant Lamb argues that the charge of the court was confusing and erroneous in relation to its contention that at the time of the accident West had temporarily passed from the employ of Lamb into that of Truskey for purposes of legal responsibility for any negligence of West in the raising of the pipe. That argument is based on the position that since West was being signalled by Truskey employees he became part of the Truskey employee group. The contention is that in effect the court charged the jury that it must consider Lamb to have been West's responsible master rather than Truskey. No objection was raised to this portion of the charge. We therefore examine the nature of the defect asserted to see if "plain error" is made out. We will not *66 set forth the portions of the charge challenged in this regard as we are satisfied that under the evidence Lamb was in fact and in law the master of West and responsible for his negligence, within the application of the rule of respondeat superior, so that the charge of the court could not have harmed the defendant Lamb in this respect.
The law relating to the subject matter of the present discussion has taken definitive shape since the concurring opinion of Judge (now Justice) Schettino in Devone v. Newark Tidewater Terminal, Inc., 14 N.J. Super. 401, 406-419 (App. Div. 1951), the philosophy of which was recently followed by us in Viggiano v. William C. Reppenhagen, Inc., 55 N.J. Super. 114, 118-119 (App. Div. 1959). In the latter case we said:
"Since an employer is responsible for the tort of his employee acting within the scope of the employment whether or not the employer was controlling the details of the work at the time the tort occurred (e.g., the driver of a delivery truck as an employee of the defendant), there is no reason in logic or policy for abating that liability of the general employer in such a situation as that before us [negligent injury of a third person by the employee] on the basis of whether or not the contracting-borrowing employer was exercising any degree of control or direction of the employee in respect to the execution of the details of the work to be accomplished with the supplied equipment, so long as what was being done with it was within the contemplation of the supplier in renting it to another.
As pointed out by Judge Schettino, the special employer (rentee of the equipment and operator) may make himself also liable by exercising control in a negligent manner, or make himself solely liable by directing the employee to do an act beyond the service contracted for. (14 N.J. Super., at page 415.) But as long as the work being done is within the general contemplation of the supplier of the equipment and operator, its performance is furthering the interest of the general employer in the sense that it is carrying out the latter's contractual obligation. This is not less so because the operator is following directions of the so-called special employer in respect to work details. That such direction would or might occur is in the contemplation of the contracting parties." (Emphasis by the court)
In the present case a jury could not reasonably have disagreed with the following facts and conclusions. Notwithstanding *67 Lamb's letting Truskey have the use of its equipment and West's services in operating it for a fixed hourly charge, the work West was doing in lifting pipe on the cable was nevertheless within Lamb's general contemplation, and this none the less because the work required West to follow signals or directions of the Truskey people. See Larocca v. American Chain and Cable Co., 13 N.J. 1, 7 (1953). In doing that work West was furthering the interest of his general employer, Lamb, in that the purpose of letting out the equipment was being fulfilled. There was no evidence that Truskey had West do anything beyond the service contracted for. Therefore, under the cases cited, Lamb remained liable for the results of West's negligence, whether or not Truskey might have been concurrently negligent, a circumstance of no relevance insofar as plaintiff's action against Lamb is concerned (plaintiff was not suing Truskey). The present issue is not controlled by any consideration as to whether West passed out of the employ of Lamb and into that of Truskey, under the facts here presented and the currently recognized principles cited above, and there is thus no prejudicial or "plain error" in respect of the charge to the jury in that regard.

III.
Defendant Lamb urges that the trial court erred in granting the motion of the third-party defendant Truskey for dismissal of the third-party claim. That claim was based upon the inclusion of the following provision in the contract (denominated a "purchase order") between Lamb and Truskey:
"Liability for Damage: Seller [Truskey] will indemnify, save harmless and defend Buyer [Lamb] from all liability for loss, damage, or injury to persons or property in any manner arising out of or incident to this order. * * *"
To assist the court in the determination of the question of the liability of Truskey to Lamb under this contract *68 provision, should the jury decide for the plaintiff against Lamb, the trial court, with the concurrence of the parties, asked the jury to render special answers to two written interrogatories: 1. "Was there negligence on the part of Robert E. Lamb, Inc., a corporation, through its agents, servants or employees, which was the proximate cause of the injury sustained by the plaintiff, Howard Cross, on July 29, 1957?" 2. This question was the same as 1., except for the substitution of the corporate name of Truskey in place of that of Lamb. The jury unanimously answered the first question in the affirmative, the second in the negative.
The construction and application of the contract provision quoted are governed by the law of Pennsylvania, where the contract was made. Buzzone v. Hartford Accident & Indemnity Co., 23 N.J. 447, 452 (1957). Moreover, it was there that both parties had their domicile and the stipulation for indemnification was to be performed. Lamb produced a Pennsylvania lawyer as a witness who gave it as his opinion, on cross-examination, that the courts of that state would not enforce an agreement of this tenor in favor of the indemnitee where the accident was caused solely by its own negligence. Consultation of the Pennsylvania cases indicates that they adhere to the so-called "strict construction" rule which requires that an indemnitee's protection against the consequences of his own negligence must be clearly and unequivocally expressed in the agreement and that any ambiguities must be resolved against coverage. See Schroeder v. Gulf Refining Co., 300 Pa. 405, 150 A. 665, 667 (Sup. Ct. 1930); Perry v. Payne, 217 Pa. 252, 66 A. 553, 555, 11 L.R.A., N.S., 1173 (Sup. Ct. 1907); Camden Safe Deposit & Trust Co. v. Eavenson, 295 Pa. 357, 145 A. 434, 436 (Sup. Ct. 1929); Housing Authority of City of Pittsburgh v. Sanctis Const. Inc., 158 Pa. Super. 71, 43 A.2d 581, 583 (Super. Ct. 1945); Brown v. Moore, 247 F.2d 711, 723 (3 Cir. 1957); cf. Tidewater Field Warehouses v. Fred Whitaker Co., 370 Pa. 538, 88 A.2d 796, 797 (Sup. Ct. 1952). It is doubtful whether under these authorities *69 recovery would be allowed the indemnitee in Pennsylvania even in a case of concurrent negligence of indemnitee and indemnitor, but that question is not material under the postulates concerning the parties' negligence required by the evidence and findings here.
For purposes of the point under discussion the case before us must be taken to be one in which Lamb was negligent and Truskey not. The special verdict of the jury definitely establishes Truskey's freedom from negligence in the sense of careless conduct by its own employees. Nor can it be regarded as negligent in the sense of special employer of West, within the scope of what was said in our opinion in Viggiano v. William C. Reppenhagen, Inc., supra, since the finding just mentioned precludes the notion that it was exercising its limited control over West in a negligent fashion and the evidence indicates that it was not directing West to do something beyond the service contracted for by Truskey with Lamb, 55 N.J. Super., at p. 119; and see the concurring opinion in Devone v. Newark Tidewater Terminal, Inc., supra, 14 N.J. Super., at p. 415. Consequently, Lamb being solely responsible for the plaintiff's injury vis-a-vis Truskey, the Pennsylvania rule precludes recovery on the indemnity agreement.
Lamb places reliance upon our own decision in Stern v. Larocca, 49 N.J. Super. 496 (App. Div. 1958). However, as indicated, the case before us must be decided on the basis of the Pennsylvania authorities. Moreover, even the Stern case recognizes the unlikelihood of recovery by an indemnitee whose active negligence is the sole cause of the injury sued for, 49 N.J. Super., at pages 508-509; and see George M. Brewster & Son v. Catalytic Const. Co., 17 N.J. 20 (1954). For a general discussion of the entire subject see the full opinion in Stern v. Larocca, supra.
Under the facts found by the jury and the controlling law the trial court acted correctly in dismissing the third-party complaint.

*70 IV.
We arrive at a consideration of the most meritorious of Lamb's grounds of appeal  the use by plaintiff's counsel of a summation blackboard-technique which defendant contends operated to swell the verdict well beyond a just recovery under the proofs.
At the outset, we emphasize that we do not minimize the severity and permanency of the injuries which plaintiff sustained to his hand and fingers. Both his general disability and the reduction of his effectiveness as a welder are obvious from the proofs. The testimony indicates that kind of work frequently involves climbing and work aloft. Plaintiff's pre-accident modus operandi often required climbing towers and partly finished structures carrying in one hand a welding rod and dragging 25 to 50 feet of cable with the other. At the work-station he sometimes had to cling for support with one hand and weld with the other. Welding requires a firm grip and a steady hand, the rod being constantly held within a range of between 1/16 and 3/16 inch from the pipe. Plaintiff's specialty, not possessed by all welders, was "downhill welding," requiring special experience, skill, dexterity and sustained effort over extended periods. This can only be properly done with one hand.
Plaintiff demonstrated on the stand that he can no longer manipulate the welding rod and cutting torch, which are the tools of his trade, with any degree of sustained control, and must now use both hands even for the simple operation he is now able to perform as a "tacker" (apprentice welding work of the least precise and remunerative type). His own testimony of greatly diminished powers of grip, dexterity, and hook is born out by all the medical experts; likewise his testimony of loss of the sense of touch in the injured member and painful sensitivity to cold. ("Everything I touch now, it feels rough when I touch it, like sandpaper.") He cannot make a fist, and has very limited flexion of the three middle fingers.
*71 The specific injury, as testified to on behalf of plaintiff by Dr. Lee, the treating surgeon, and Dr. Brown, the orthopedic specialist, and by Dr. Grenhart, an orthopedic surgeon testifying for defendant, was a compound fracture in each of those fingers and an injury to the hypothenar eminence limiting the movement of the thumb. Because of destruction of nerves and blood supply in the hand resultant from the accident, the fractures never healed properly and the joint structure of the fingers is permanently affected by fibrotic change (manifested by an arthritic type of stiffening). The parasthetic condition (loss of sense of touch) was affirmed by Drs. Brown and Grenhart, Dr. Brown also testifying to permanent circulatory loss.
Plaintiff was given a series of physiotherapy treatments, which were unsuccessful, however, in restoring the hand to anywhere near a normal functioning unit. Dr. Brown was of the opinion that the lapse of a year and a half and the fibrotic changes which had taken place during that period indicated that the stiffness of the fingers would not appreciably abate with time and exercise. He estimated the disability as 75% of the total function of the hand as related to plaintiff's pre-accident need of and use of his right hand (that is, he can only do 25% of the motions and functions he is required to do by his employment, and those he can do are done with only 25% efficiency). Dr. Grenhart estimated the disability at 33-1/3%.
Plaintiff testified to most severe pain during the initial period following the accident when he was in the hospital for 11 days (in order to facilitate administration of antibiotics necessary because of the open wounds), and continual ache in his hand ever since, becoming severe in cold weather and extending to his shoulder after work attempts. He was required to have his arm in a cast for about seven weeks after the accident in order to assure extension of his middle finger during the bone healing period.
Plaintiff was able after his injury to resume welding work on November 4, 1957, but never did anything involving *72 climbing or first-class welding. Yet he apparently had been paid at the top-grade rate of $4.25 per hour on all of his jobs until and as of the time of trial, in December 1958. He was then doing a tacking job which he had held since May 1958. That particular job was expected to last only six more weeks. Previously, when he was out of work between jobs, there were assignments available which he couldn't fulfill because of his disability. There was some proof that whereas a "first-class pipe welder" is customarily paid at the rate of $4.25 an hour, a welder working at a bench in a shop gets only from $2.50 to $2.75 per hour.
The proofs were that all these welding jobs are by assignment of the union business agent. When one job ends the worker returns to the union for assignment to another. If there is no local work he is sent to another territory. Plaintiff had been working steadily for a long time before the accident. He was not "unemployed to amount to anything." But the union agent testified, with respect to the present situation:
"Q. Is there a limit to how long you can choose jobs that he can do? Can you keep right on doing that year after year? A. No, you can't do that. Everybody or every welder in the union must get an equal break, and if it comes time for him to be given a job if there is unemployment, and time for him to be sent to work, and if he can't compete with the men on the job, then, evidently, I mean, contractors are not going to pay $4.25 for a welder if he can't produce work for him.
Q. In your opinion, can this man compete with other men on the job? A. At this time, no."
In the course of the summation by plaintiff's counsel, he illustrated his argument in respect of the claim for damages by computations of past and prospective future losses of earnings, along with other matter, on a blackboard before the jury. This was strenuously and repeatedly objected to by counsel for Lamb, primarily on the grounds that the computation of future losses implied certainty of the amounts stated, that the figures for lost future wages and the claimed working-period expectancy of the plaintiff (to the age of 65) *73 were not supported by the proofs, and that the figures and computations and their inscription on the blackboard had "an inflammatory effect." The objections were overruled and the court advised counsel for defendant that his objection would be taken as a continuing one to all summation by counsel along such lines. Basically the same objections, with embellishments, are urged by Lamb on appeal. The argument is that the allusions to the figures and computations and their highlighting by use of the blackboard was erroneous and prejudicial and resulted in inflation of the verdict as rendered beyond any foundation therefor in the proofs. The blackboard was photographed at the end of the trial. It contained the following:

"HOWARD CROSS 
 10/17/17  41  Exp. 30.29 yrs. = 1575 wks. = 11,000 days
 Age 65  23 1/2 yrs.
 $4.25 $4.25
 -2.50 -2.75
 _____ _____
 $1.75 less $1.50 less
 Medical expenses $587.00
 Lost wages 142 days
 @ $32.00 4,544.00
 _________
 $5,131.00
 Pain and suffering,
 to present 485 days $
Future:
 $1.75 x 40 = $70 × 52 = $3640 less per year
 $1.50 x 40 = $60 × 52 = $3120 less per year
 $3640 per year × 30 years = $109,200.00
 $3120 per year × 30 years = 93,200.00
 $3640 per year × 23 1/2 yrs. = 85,540.00
 $3120 per year × 23 1/2 yrs. = 72,320.00
 $
Pain and suffering, for rest of life 
 one lump sum. $
 __________"

Blackboards are frequently used by trial counsel for three purposes: explanation, specification and argument, and sometimes one or more of these in combination. In the first *74 category fall such techniques as diagramming the scene of an accident and sketching by an expert witness to explain technical testimony more easily comprehended in graphic form. See Annotation, 9 A.L.R.2d 1044 (1950). This practice is generally approved, ibid., and see 3 Wigmore, Evidence (3d ed. 1940), § 789, p. 172 et seq.; American Bar Association, Section of Insurance, Negligence and Compensation Law, 1958 Proceedings, Symposium, Use of Blackboards during Trial, 223-245 (articles by Allen, Gillen and Shepherd); 88 C.J.S. Trial § 45, p. 115; and is subject to the discretionary supervision of the trial court. See Ottenberg v. Ryan & Riley Co., 130 Md. 38, 99 A. 984, 988 (Md. Ct. App. 1917); Cincinnati St. Ry. Co. v. Waterman, 50 Ohio App. 380, 198 N.E. 494 (Ct. App. 1935).
The blackboard functions of specification and argument are often interrelated. The former is primarily an aid to memory and consists of the listing of items and figures not easily memorized by jurors when heard orally. This is essentially the same trial aid as the practice sanctioned by our rule of court permitting the preparation and delivery to the jury for use in their deliberations of "a list of the claims made by the parties and of the defenses to such claims, a list of the various items of damage upon which proof was submitted at the trial and a list of the verdicts that may be properly found by the jury." R.R. 4:52-2.
The use of the blackboard for purposes of argument  the phase primarily involved in the present case, is of more recent development. See 1 Belli, Modern Trials (1954), Ch. VIII, pp. 846-847. Its most characteristic application, as here, is in the listing and computation of damages. Some of the reported cases concerning this problem involve the use of large charts, rather than blackboards, but the legal questions presented are the same. That the purpose of this kind of use of blackboards (aside from the function of simple specification, discussed above) is essentially exhortatory and not explanatory is apparent from the commonly expressed judicial justification therefor  anything which counsel has the *75 right to argue as a legitimate interpretation of or inference from the evidence he is free, within the discretionary control of the trial court, to write upon the blackboard. See Four-County Electric Power Ass'n v. Clardy, 221 Miss. 403, 73 So.2d 144, 151, 44 A.L.R.2d 1191 (Sup. Ct. 1954); McLaney v. Turner, 267 Ala. 588, 104 So.2d 315, 322 (Sup. Ct. 1958); Ratner v. Arrington, 111 So.2d 82, 86-87 (D. Ct. App. Fla. 1959). Conversely, what counsel may not argue, he may not write on the board. Warren Petroleum Corporation v. Pyeatt, 275 S.W.2d 216, 219 (Tex. Ct. Civ. App. 1955). Thus, in states where, as in New Jersey under Botta v. Brunner, 26 N.J. 82 (1958), pain and suffering is not equatable with specific amounts of money, for purposes of argument to the jury, figures for such items may not be written on the blackboard, Certified T.V. and Appliance Company, Inc. v. Harrington, 201 Va. 109, 109 S.E.2d 126 (Sup. Ct. 1950); Henne v. Balick, 146 A.2d 394 (Del. Sup. Ct. 1958).
While there has been no clear discussion hitherto of the extent of the necessary evidential support for the figures which are placed on the blackboard, the courts are all in agreement on the primary requisite that there must be some evidential basis therefor. See Magnolia Petroleum Company v. Herman, 295 S.W.2d 430 (Tex. Ct. Civ. App. 1956); Simpkins v. Manners, 34 Tenn. App. 244, 236 S.W.2d 984 (Ct. App. 1950); Haycock v. Christie, 101 U.S. App. D.C. 409, 249 F.2d 501 (D.C. Cir. 1957); Davis v. Haldeman, 150 F. Supp. 669 (D.C.E.D. Pa. 1957); Minch v. Local Union No. 370, etc., 44 Wash.2d 15, 265 P.2d 286, 292 (Sup. Ct. 1953); McLaney v. Turner; Ratner v. Arrington; Four-County Electric Power Ass'n v. Clardy; Certified T.V. and Appliance Company, Inc. v. Harrington, all supra.
To minimize the possibility of prejudice the jury should be given to understand by the court as well as counsel that the figures written on the board are not evidence. Green v. Rudsenske, 320 S.W.2d 228 (Tex. Ct. Civ. App. 1959); *76 Clark v. Hudson, 265 Ala. 630, 93 So.2d 138 (Sup. Ct. 1957); Miller v. Loy, 101 Oh. App. 405, 140 N.E.2d 38, 40 (Ct. App. 1956); but see Johnson v. Charleston & Western Carolina Ry. Co., 234 S.C. 448, 108 S.E.2d 777, 785 (Sup. Ct. 1959); cf. Matthews v. Nelson, 57 N.J. Super. 515 (App. Div. 1959), certif. denied 31 N.J. 296 (1960) (not a blackboard case), stressing the importance of an instruction on the non-evidential character of an argument on damages. In the same vein, the blackboard should be under view by the jury only during the argument in which counsel who has written the figures is discussing damages. See Kimbell v. Noel, 228 S.W.2d 980 (Tex. Ct. Civ. App. 1950); McLaney v. Turner; Ratner v. Arrington; Davis v. Haldeman, all supra; Kindler v. Edwards, 126 Ind. App. 261, 130 N.E.2d 491 (App. Ct. 1955).
With these general principles as background, we turn to the argument and blackboard entries made by plaintiff's counsel here. We observe, preliminarily, that we find nothing prejudicial insofar as the references to pain and suffering are concerned, notwithstanding defendant's argument to the contrary. No figures were suggested, either by unit or in total, for pain and suffering. If the effect of some of the notations was to remind the jury that plaintiff had suffered during the 485 days since the accident, this was a fact proven by the evidence, and it was also inferable from the proofs that he would have pain for the remainder of his life. The life expectancy of 30.29 years was taken from the table of mortality incorporated in the rules of court, and both plaintiff's counsel and the court told the jury that the table was only a general guide based upon average expectations and might or might not turn out to be true in plaintiff's case, and that the jury might exercise its own judgment in this respect. See Kappovich v. LeWinter, 43 N.J. Super. 528, 532, 533 (App. Div. 1957). Since the jury properly had the plaintiff's life expectancy of 30.29 years before it there was no prejudicial effect in its being apprised by counsel what it could have calculated for itself *77  that this was equal to 1,575 weeks and 11,000 days. We find no merit in the argument that this connoted to the jury that it should determine its award for pain and suffering by first arriving at a daily or weekly unit of damage for that item and then multiplying it by the number of days or weeks of the period. Cf. Botta v. Brunner, supra.
But we do agree with defendant's appellate complaint with respect to the blackboard references to loss of future earnings, specifically as to annual units of loss, total elapsed periods, and grand totals, most significantly as to the latter. There was inadequate and, in some respects, no support for these figures in the evidence. The totals so derived and placed upon the blackboard, with the expectable and undoubtedly intended trenchant effect upon the minds of the jurors, unquestionably operated prejudicially against the defendant.
The proofs in this case made it very dubious that the kind of work plaintiff testified was entailed in his first-class welding job classification could have been performed until his expectancy age of 71, or even until the so-described "retirement age" of 65, which counsel used in summation without any pretense of evidential support therefor. The characterization of the physical requirements of the job taken from plaintiff's own brief well illustrates the point.
"All first-class pipe welders are required to work aloft on ladders and scaffolds as well as on the ground, inside and outside, in precarious and dangerous locations, in awkward and cramped positions, requiring great dexterity of body and limbs. Obviously, only the physically-strong and well-coordinated are able and permitted to perform this work. Consequently the wages of these workers are relatively high."
Plaintiff offered no proof that men approaching the ages of 65 or 70 could do work so described, or commonly did so in the trade, and common sense would indicate the contrary. Yet the underlying assumption of those hypotheses of fact was basic to counsel's representation that the jury might select any of the four grand totals for future loss of earnings *78 stated on the blackboard as supported by the evidence. Indeed, in the course of his computations, counsel said to the jury: "I don't think, ladies and gentlemen, it is fair to say the man is going to work those 30 years [life expectancy]  it would be more fair to say he will work, if good health permits, to age 65 * * *." Yet the grand totals on the life expectancy basis nevertheless went on the board, and counsel in patent self-contradiction said: "You don't need to accept the figure I have placed on the board, but these are all according to the evidence and really undisputed by any proof brought by the other side * * *. This is given to you as an illustration of what it comes to on the basis of the testimony and only on the basis of the testimony * * *." (Emphasis ours)
To be distinguished are cases where there is proof or general common knowledge that work of the type done by the plaintiff, the wage rate thereof being the argued basis for loss of earnings, may feasibly be continued for the life expectancy or up to a particular retirement age. See Bone v. General Motors Corporation, 322 S.W.2d 916 (Mo. Sup. Ct. 1959) (retirement age of 65 for railroad switchman permitted, but reluctantly, to be used without proof); but compare Hallada v. Great Northern Railway, 244 Minn. 81, 69 N.W.2d 673, 685, 687 (Sup. Ct. 1955) (stressing that life expectancy and working life may not be assumed to be identical), the restrictive effect of which was modified by Boutang v. Twin City Motor Bus Company, 248 Minn. 240 80 N.W.2d 30 (Sup. Ct. 1956), and Flaherty v. Minneapolis & St. Louis Railway Co., 251 Minn. 345, 87 N.W.2d 633 (Sup. Ct. 1958).
The second weakness in the requisite evidentiary under-girding of the grand totals given the jury is the assumption that plaintiff's losses of the $1.50 or $1.75 per hour differential would begin the day the trial was over and necessarily continue at all times thereafter (for the indicated period). But the evidence was that at the time of the trial and for some seven months previously, as well as intermittently *79 theretofore since the accident, plaintiff was and had been receiving the higher rate of $4.25 for "tacking" and other supposedly easy welding work. The only qualification clearly cast by the witness Dugan upon the probability of plaintiff's continuing to receive that wage rate was in the event there should be future unemployment and plaintiff at that time be unable to compete with other welders. The former factor was a problematical future contingency, not a present certainty, as necessarily hypothesized by the grand totals on the blackboard. While it was clear that plaintiff would not be able to compete on equal terms with other welders for at least a long time, translation of this into a definite pecuniary loss, under the existing facts, was speculative. Yet the totals on the blackboard obviously assumed a certain loss of $1.75 or $1.50 per hour for every day of the indicated expectancies, beginning with the date of judgment.
Finally, the formulae leading to the indicated totals failed to allow for the almost inescapable statistical probability that plaintiff would have lost some working time over the years by reason of vacations, lay-off time between job assignments, illnesses, strikes and the other contingencies of lost time to which workmen on hourly employment are necessarily subject. Cf. Minch v. Local Union No. 370, etc., supra.
While the evidence adduced by the plaintiff would have permitted his counsel to properly argue to the jury that it would be justified in including in its verdict a substantial allowance for loss of future wages, see Coll v. Sherry, 29 N.J. 166, 176 (1959) (just as it would similarly not have precluded defense counsel from arguing the contrary), the specification in summation of such totals as $109,200 and the others, arrived at in the manner indicated, and represented by counsel as warranted by the evidence for that item, was erroneous since the proofs and the reasonable probabilities could not have justified a verdict inclusive of any of them for the item in question. See Henne v. Balick, supra; Warren Petroleum v. Pyeatt, supra; cf. Blackman *80 v. West Jersey & Seashore R.R. Co., 68 N.J.L. 1, 4 (Sup. Ct. 1902). Moreover, the very proffer of four different totals for lost future wages was strongly calculated to suggest to the jury that they were being given a fair choice of all reasonably possible estimations for the item  a position misleading as well as unfounded in the evidence. The placing of the figures on the blackboard heightened the prejudicial effect of their specification and, in our judgment, undoubtedly contributed materially to the verdict returned by the jury. See Purpura v. Public Service Elec. & Gas Co., 53 N.J. Super. 475 (App. Div. 1959). At no time did the court inform the jury that counsel's formulae and figures did not constitute evidence of future losses of earnings, even when overruling the defense objections during summation or when hearing counsel admit it would not be "fair" to use the life-expectancy basis for his calculations while doing that very thing.
We do not suggest that there are no situations at all in which the general formula approach to argument of lost future wages, with or without use of a blackboard, could properly be employed. As in trial practice generally, a broad discretionary area reposes with the trial judge. We decide only that what was done here was improper and prejudicial for the reasons we have assigned.
The reduction of the verdict by the trial court to compensate for failure to reflect the element of present value of future losses does not cure the verdict of its fatal infection by the blackboard summation as it does not undertake to allow for the prejudicial effects thereof noted above. Nor will we indulge in an independent evaluation of the damages to save the verdict as reduced. This is peculiarly a function for the jury, and the case will have to be retried for that purpose.
We do not agree with defendant's contention that the amount of the verdict as rendered is so excessive as to demonstrate such bias, passion, mistake or partiality as would warrant setting aside the determination as to liability as well *81 as damages. We have discussed the evidence reflecting the degree of plaintiff's disability. Any excessiveness in the verdict is traceable to the summation alone. The conclusions as to liability, both with respect to the plaintiff's claim against the defendant Lamb and as to the answers to the special interrogatories, are, as we have already indicated, well supported, if not compelled, by the proofs on these matters. They will remain undisturbed. See Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 149 (1950).
Defendant raises for the first time on appeal the question as to whether the trial court should have charged the jury that the recovery would not be subject to income tax and that in estimating future losses of earnings allowance should be made for the taxes which would come due thereon. This subject is one of some complexity and controversy, and we are not inclined to treat of it in the abstract, the point not having been made below and there being no assurance that on the retrial the defendant will request such a charge. Most of the cases hold there is no right to such an instruction in view of the uncertain and conjectural nature of the amount of future taxes on future earnings of a particular individual. See Annotation, 63 A.L.R.2d 1393 (1959); Hall v. Chicago & Northwestern Ry. Co., 5 Ill.2d 135, 125 N.E.2d 77, 86, 50 A.L.R.2d 661 (Sup. Ct. 1955); Stokes v. United States, 144 F.2d 82 (2 Cir. 1944). Contra: Floyd v. Fruit Industries, 144 Conn. 659, 136 A.2d 918, 63 A.L.R.2d 1378 (Sup. Ct. Err. 1957).
Defendant has also raised on appeal, but not below, the point that the court's charge failed to direct the jury to determine the present capitalized value of the lost future earnings. Kappel v. Public Service Ry. Co., 105 N.J.L. 264 (Sup. Ct. 1929); Noa v. LeGore, 131 N.J.L. 229 (E. & A. 1944). The practice of multiple appellate assaults upon trial actions not complained of below is very much to be deprecated, particularly where the fact that the questions were not raised below is not noted in the Statement of Questions Involved, as required by R.R. 1:7-1(c). See State *82 v. Daquino, 56 N.J. Super. 230, 233, 241 (App. Div. 1959). Proper attention to the element of present value will undoubtedly be afforded on the retrial.
Judgment affirmed on liability; reversed as to damages. Remanded for retrial as to damages only. No costs on this appeal as between plaintiff and defendant Lamb; costs in favor of third-party defendant Truskey against third-party plaintiff Lamb.
We have carefully examined the other grounds of appeal urged by defendant and find them without merit.