815 A.2d 460

DAVID CARTER AND DONNA CARTER, HUSBAND AND WIFE, PLAINTIFFS–RESPONDENTS, v. ALICE F. REYNOLDS, DEFENDANT,STEVENS, FLUHR, CHISMAR, ALVINO & SCHECHTER, C.P.A., DEFENDANT–APPELLANT.

Argued November 7, 2002—Decided February 19, 2003.

*Stephen R. Dumser* argued the cause for appellant (*Gercke, Dumser, Shoemaker & Sierzega,* attorneys; *Mr. Dumser* and *Ronald P. Sierzega,* on the brief).

*Alan H. Sklarsky* argued the cause for respondents (*Tomar O'Brien Kaplan Jacoby & Graziano,* attorneys).

The opinion of the Court was delivered by

LONG, J.

In this appeal, we are called on to determine whether the doctrine of *respondeat superior* may be invoked to hold an employer vicariously liable for the tort of an employee. More particularly, we have been asked to decide whether the automobile negligence of an employee, who was required by her employer to use her personal car on mandatory client visits, subjected the employer to liability for an accident when the employee was on her way home from a client's location. Applying well-established principles of our law, we have concluded that it does.

I

The facts of the case are detailed in the Appellate Division decision. *Carter v. Reynolds,* 345 *N.J.Super.* 67, 783 *A.*2d 724 (App.Div.2001), *leave to appeal granted,* 172 *N.J.* 170, 796 *A.*2d 889 (2002). We repeat only those that are necessary to our disposition. Defendant Alice Reynolds was the owner and operator of a vehicle that struck plaintiff, David Carter, on January 15, 1997, in Belmar, New Jersey. At the time of the accident, Reynolds, who resided in Brielle, New Jersey, was employed by the accounting firm of Stevens, Fluhr, Chismar, Alvino & Schechter, CPA, (the firm), located in Neptune, New Jersey.

At the firm, Reynolds was a non-professional, part-time employee who conducted detail work for auditors. She was responsible for the verification, checking, and preparation of bank reconciliations. Her job required her to work in the firm's Neptune office, and also to visit clients. Vincent Alvino, a partner in the firm, testified that Reynolds spent approximately sixty to seventy percent of her time at the firm's Neptune office and twenty-five to thirty percent at client locations. There was no office car available to Reynolds; thus, she was required to use her own vehicle for travel, with business mileage reimbursed by the firm under the Internal Revenue Service's (IRS) then prevailing allowance of 31½ cents per mile. With respect to travel reimbursement, Alvino testified that, in accordance with IRS rules, Reynolds could

claim mileage from the office to the client assignment and from the client assignment back to the office and in the event that she was traveling from home, it would be the mileage from her home to the client or from the office to the client, whichever was closer, and that would also hold true for the return trip. If she was traveling from the client back home, she would get the shorter distance of the mileage from the client to home or the client to the office.

With respect to billing, on the days Reynolds traveled from her home to the client, she would begin billing when she arrived at the client's destination. On the days that she went directly home after meeting with a client, she would stop billing when she left the client, not when she actually arrived at home. If she had to

return to the office after meeting with a client, she would bill for her travel time to the firm.

On the day in question, Reynolds spent the morning at the firm, and then traveled to Deal to a client location. Reynolds spent the remainder of the day working in Deal. She testified that she was reimbursed for the mileage from Deal to Neptune, but that she was not paid wages for her travel time. At approximately 4:29 p.m., when Reynolds was traveling from Deal to her home, the accident occurred.

On November 3, 1997, Carter filed an automobile negligence action against Reynolds. Later, Carter filed an amended complaint adding the firm as a defendant, alleging that Reynolds was an employee, servant, and/or agent of the firm when the accident occurred because she was in the scope of her employment.

The firm filed a motion for summary judgment and Carter filed a cross-motion. The trial court granted the firm's motion, leaving Reynolds as the sole defendant in the case. On Carter's motion for reconsideration based on new precedent, the trial court determined that Reynolds was, in fact, acting within the scope of her employment when she struck him and thus, granted Carter's motion for partial summary judgment with respect to *respondeat superior* liability.

The firm moved for leave to appeal the interlocutory order, which motion was granted. In a published opinion, the Appellate Division affirmed the trial court's grant of partial summary judgment to Carter, reasoning that Reynolds was acting within the scope of her employment, thus making the firm liable under the doctrine of *respondeat superior*. *Carter, supra,* 345 *N.J.Super.* at 77, 783 *A.*2d 724. The firm then moved before us for leave to appeal, which motion we granted. 172 *N.J.* 170, 796 *A.*2d 889 (2002). We now affirm.

## II

The heart of the firm's argument is that the Appellate Division's decision represents a fundamental change in the law regarding an

employer's vicarious liability because the court jettisoned the element of control, which the firm maintains is a necessary aspect of the vicarious liability calculus. Carter counters that the Appellate Division merely recognized a well-established exception to the "going and coming" rule carved out for cases in which an employer requires an employee to use his or her own vehicle for work. Carter argues alternatively that Reynolds' activity on the day in question fell within the "special mission" exception to the going and coming rule. Finally, Carter urges us to consider adopting the broad "enterprise liability" theory enunciated as the *respondeat superior* standard by the California Supreme Court. *Hinman v. Westinghouse Elec. Co.*, 2 *Cal.*3d 956, 88 *Cal.Rptr.* 188, 471 *P.*2d 988 (1970) (in bank); *Huntsinger v. Fell*, 22 *Cal.App.*3d 803, 99 *Cal.Rptr.* 666 (1972).

## III

Although as a general rule of tort law, liability must be based on personal fault, the doctrine of *respondeat superior* recognizes a vicarious liability principle pursuant to which a master will be held liable in certain cases for the wrongful acts of his servants or employees. W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* §§ 4, 69 at 21–23, 499–501 (5th ed.1984); Rhett B. Franklin, *Pouring New Wine into an Old Bottle: A Recommendation for Determining Liability of an Employer Under Respondeat Superior*, 39 *S.D.L.Rev.* 570, 572 (1994). The theoretical underpinning of the doctrine of *respondeat superior* has been described as follows: that one who expects to derive a benefit or advantage from an act performed on his behalf by another must answer for any injury that a third person may sustain from it. *Winkelstein v. Solitare*, 129 *N.J.L.* 38, 40, 27 *A.*2d 868 (1942) (citations omitted), *aff'd per curiam*, 130 *N.J.L.* 158, 31 *A.*2d 843 (E. & A.1943); 27 *Am.Jur.2d Employment Relationship* § 459. (1996).

Under *respondeat superior*, an employer can be found liable for the negligence of an employee causing injuries to third

parties, if, at the time of the occurrence, the employee was acting within the scope of his or her employment. *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 619, 626 *A.*2d 445 (1993) (quoting *Restatement (Second) of Agency* § 219 (1958)). To establish a master's liability for the acts of his servant, a plaintiff must prove (1) that a master-servant relationship existed and (2) that the tortious act of the servant occurred within the scope of that employment. Those are two entirely distinct concepts governed by different legal principles. The former focuses on the nature of the relationship. If no master-servant relationship exists, no further inquiry need take place because the master-servant relationship is *sine qua non* to the invocation of *respondeat superior. See, e.g., Wright v. State*, 169 *N.J.* 422, 436, 778 *A.*2d 443 (2001) (observing that doctrine of *respondeat superior* is based on existence of master-servant relationship). If such a relationship exists, its margins are the subject of the scope of employment inquiry. *Restatement (Second) of Agency* § 228 comment a (1958).

## A.

We turn first to the master-servant relationship. Like forty-four of our sister states,[1] we recognize section 220 of the Restatement (Second) of Agency as the touchstone for determining who is a servant. *Wright, supra*, 169 *N.J.* at 436, 778 *A.*2d 443; *Mavrikidis v. Petullo*, 153 *N.J.* 117, 131–32, 707 *A.*2d 977 (1998). Section 220 provides:

(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of facts, among others, are considered:

    (a) the extent of control which, by the agreement, the master may exercise over the details of the work;

    (b) whether or not the one employed is engaged in a distinct occupation or business;

---

[1] *See Restatement (Second) of Agency* § 220 (1958) (collecting cases).

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

[*Restatement (Second) of Agency* § 220 (1958).]

Our model jury charge regarding the definition of a servant is identical to Restatement section 220 with the addition of one line: "[S]uch other factors as may be reasonably considered in determining *whether the employer has control or right to control* the person employed." *Model Jury Charges (Civil)* § 4.22(A) (June 1979) (emphasis added). As that charge intimates, "control by the master over the servant is the essence of the master-servant relationship on which the doctrine of *respondeat superior* is based." *Wright, supra,* 169 *N.J.* at 436, 778 *A.2d* 443 (quotation marks and citation omitted); *see* Keeton, *supra,* § 70 at 501 ("The traditional definition of a servant is that he is a person employed to perform services in the affairs of another, whose physical conduct in the performance of the service *is controlled, or is subject to a right of control,* by the other." (emphasis added) (footnote omitted)).

### B.

Once the master-servant relationship is established, it is necessary to decide the question of whether the particular tortious conduct took place within the scope of that employment relationship. Proof that the employer-employee relationship exists does not, in and of itself, create an inference that a given act done by the employee was within the scope of employment. *Restatement (Second) of Agency* § 228 comment b (1958).

"Scope of employment" is a commonly cited principle, but its contours are not easily defined.

> This highly indefinite phrase, which sometimes is varied with "in the course of employment," is so devoid of meaning in itself that its very vagueness has been of value in permitting a desirable degree of flexibility in decisions. It is obviously no more than a bare formula to cover the unordered and unauthorized acts of the servant for which it is found to be expedient to charge the master with liability, as well as to exclude other acts for which it is not. It refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.
>
> [Keeton, *supra*, § 70 at 502; *see Di Cosala v. Kay*, 91 *N.J.* 159, 169, 450 *A.*2d 508 (1982) ("The scope of employment standard, concededly imprecise, is a formula designed to delineate generally which unauthorized acts of the servant can be charged to the master." (citation omitted)).]

Some factors that courts have considered when assessing the scope of employment include: "the nature of the employment, the duties of the employee, whether the accident occurred in the course of fulfilling some job-related function, or whether it occurred during a trip personal to the employee." Christopher Vaeth, J.D., Annotation, *Employer's Liability for Negligence of Employee in Driving His or Her Own Automobile*, 27 *A.L.R.*5th 174, 174 (1995).

In New Jersey, as in most other states,[2] scope of employment is subject to analysis under Restatement sections 228 and 229, which provide in relevant part that an employee's conduct falls within the scope of employment if:

> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the master,
>
> . . . .
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

---

2 *See Restatement (Second) of Agency* §§ 228, 229 (1958) (collecting cases).

[*Restatement (Second) of Agency* § 228 (1958).]

Restatement section 229 provides:

(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.

(2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

(c) the previous relations between the master and the servant;

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

[*Id.* § 229; *see Government Employees Ins. Co. v. United States,* 678 *F.Supp.* 454, 456 (D.N.J.1988) (noting that New Jersey follows Restatement approach to scope of employment analysis and applying same); *Di Cosala, supra,* 91 *N.J.* at 169, 450 *A.2d* 508 (using Restatement principles to guide scope of employment analysis).]

## C.

Generally, an employee who is "going to" or "coming from" his or her place of employment is not considered to be acting within the scope of employment. *Mannes v. Healey,* 306 *N.J.Super.* 351, 353–54, 703 *A.2d* 944 (App.Div.1997) (citations omitted). That rule had its genesis in workers' compensation law and has been imported into tort law. *Courtless v. Jolliffe,* 203 *W.Va.* 258, 507 *S.E.*2d 136, 141 (1998) (per curiam) (citing 1 *Larson's Workers' Compensation Law* § 16.10 (1972)). Indeed, most jurisdictions apply the general rule that an employee who is driving his or her personal vehicle to and from the employer's workplace is not within the scope of employment for the purpose of imposing

vicarious liability on the employer. *Mannes, supra,* 306 *N.J.Super.* at 353–54, 703 *A.*2d 944 (citations omitted); *see, e.g., Freeman v. Manpower, Inc.,* 453 *So.*2d 208, 209 (Fla.Dist.Ct.App.1984); *Jones v. Blair,* 387 *N.W.*2d 349, 355 (Iowa 1986); *Logan v. Phillips,* 891 *S.W.*2d 542, 544 (Mo.Ct.App.1995); *Lundberg v. State,* 25 *N.Y.*2d 467, 306 *N.Y.S.*2d 947, 255 *N.E.*2d 177, 179 (1969); *Windsor Ins. Co. v. American States Ins. Co.,* 22 *P.*3d 1246, 1248 (Utah Ct.App.), *cert. denied,* 29 *P.*3d 1 (Utah 2001); Vaeth, *supra,* 27 *A.L.R.*5th at 233–39 (collecting cases). The Restatement addresses the going and coming rule in section 229, comment d: " 'It is essentially ... the employee's own job of getting to or from work.' " Franklin, *supra,* 39 *S.D.L.Rev.* at 587 (quoting *Restatement (Second) of Agency* § 229 comment d (1958)).

Two rationales exist to support the "going and coming" rule. *Mannes, supra,* 306 *N.J.Super.* at 354, 703 *A.*2d 944. The first is that "employment is suspended from the time the employee leaves the workplace until he or she returns." *Ibid.* That "suspension" occurs because the element of "control" is deemed lacking. *Ibid.* (citing *Jones, supra,* 387 *N.W.*2d at 355; *Logan, supra,* 891 *S.W.*2d at 545). The second is that the employer derives no benefit from the commute. *Kester v. Mattis, Inc.,* 44 *Mich.App.* 22, 204 *N.W.*2d 741, 742 (1972) (per curiam); *Logan, supra,* 891 *S.W.*2d at 544; *Klopp v. Rape,* 26 *Ohio App.*2d 281, 271 *N.E.*2d 315, 317 (1970) (per curiam). Those rationales are essentially inversions of the Restatement standards for vicarious liability. One commentator has explained that the purpose that underlies the going and coming rule is that "it is unfair to impose unlimited liability on an employer for conduct of its employees over which it has no control and from which it derives no benefit." Franklin, *supra,* 39 *S.D.L.Rev.* at 588 (footnote omitted). In essence, when employees travel to or from work they are deemed to be acting in their own interests without constraints by the employer regarding the method or means of the commute.

■ There are, however, exceptions to the going and coming rule. Those exceptions are also rooted in workers' compensation

law but have been engrafted onto tort law. *See, e.g.,* 1 *Larson's Workers' Compensation Law* §§ 14.05, 15.05, 16.02 (2002). Thus, *respondeat superior* has been held to apply to a situation involving commuting when: (1) the employee is engaged in a special errand or mission on the employer's behalf; (2) the employer requires the employee to drive his or her personal vehicle to work so that the vehicle may be used for work-related tasks; and (3) the employee is "on-call." *Mannes, supra,* 306 *N.J.Super.* at 354–55, 703 *A.*2d 944 (citations omitted).

█ Those so-called "dual purpose" exceptions cover cases in which, at the time of the employee's negligence, he or she can be said to be serving an interest of the employer along with a personal interest. *Gilborges v. Wallace,* 78 *N.J.* 342, 351, 396 *A.*2d 338 (1978) (noting that New Jersey has adopted dual purpose exception, which provides basis for employer liability when employee is furthering employer's business as well as his or her private interests). It makes sense that those exceptions to the going and coming rule exist. Unlike ordinary commutation in which an employer really has no interest, each of the noted exceptions involves some control over the employee's actions and a palpable benefit to be reaped by the employer, thus squarely placing such conduct back into the vicarious liability construct of the Restatement.

This case involves the required-vehicle exception described above. In *Mannes, supra,* that exception was recognized but ultimately held inapplicable because at the time of the accident, the employer did not require the employee to use a particular vehicle. 306 *N.J.Super.* at 355, 703 *A.*2d 944. It was also recognized in *Pfender v. Torres,* where plaintiff was injured by the automobile negligence of Torres, an employee of Don Rosen Imports, Inc. (DRI). 336 *N.J.Super.* 379, 383, 385, 393–94, 765 *A.*2d 208 (App.Div.), *certif. denied,* 167 *N.J.* 637, 772 *A.*2d 938 (2001). At the time of the accident, Torres was driving to work in a car provided by DRI, which he used as a personal vehicle and which had to be available as a demonstrator at the car dealership.

*Id.* at 393, 765 *A*.2d 208. The car was also used during the workday for work-related errands. *Ibid.* The trial court directed a verdict in favor of DRI at the conclusion of the evidence. *Id.* at 392, 765 *A*.2d 208. The Appellate Division reversed. *Id.* at 394, 765 *A*.2d 208. In so doing, the court invoked the required-vehicle exception:

> DRI's liability under that well-recognized exception is clear since Torres was driving to work when the accident happened and he was required to use the car in the performance of his employment as a demonstrator to encourage sales and to run work-related errands.

> [*Ibid.*]

*See also O'Toole v. Carr,* 175 *N.J.* 421, 815 *A*.2d 471 (2003) (recognizing required-vehicle exception). That is the backdrop for our inquiry.

## IV

A master-servant relationship plainly existed between Reynolds and the firm. Further, the Appellate Division concluded that because Reynolds spent one-third of her work time on the road visiting firm clients; was required by the firm to have her own car available for such activities; and actually was returning from a client visit at the time of the accident, she came within the required-vehicle exception to the going and coming rule outlined in *Mannes* and applied in *Pfender. Carter, supra,* 345 *N.J.Super.* at 74, 783 *A*.2d 724. We agree.

The firm's contrary view—that the required-vehicle exception is narrower than the Appellate Division realized—is based upon *Oaks v. Connors,* 339 *Md.* 24, 660 *A*.2d 423 (1995). There, the defendant was required to have a personal vehicle for traveling on his job between his employer's stores. *Oaks, supra,* 660 *A*.2d at 425. He was involved in an accident on his way to a work assignment, *id.* at 425, and plaintiffs argued that the employer was vicariously liable because defendant was transporting a vehicle to the job site that the employer required him to have available for use in the course of his employment, *id.* at 427. The intermediate appellate court agreed. *Connors v. Oaks,* 100 *Md.App.* 525, 642

A.2d 245, 251 (1994) (finding employer vicariously liable under *respondeat superior* for employee's negligent operation of his personal vehicle while commuting to work when employer required employee to bring his personal vehicle to work to fulfill job-related responsibilities), *rev'd*, 339 *Md.* 24, 660 *A.*2d 423 (1995). The Maryland Court of Appeals reversed. Although recognizing the required-vehicle exception and acknowledging that the employer directed the employee to have a vehicle available for work-related tasks, *Oaks* held that because the employee was neither actually performing a work-related task nor advancing his employer's business purposes at the time of the accident, the exception did not apply. *Oaks, supra,* 660 *A.*2d at 427. The court further observed that the employer "exerted no control over the method or means by which the employee operated his vehicle." *Ibid.*

■ We disagree with that rather narrow analysis. To be sure, ordinary commuting is beyond the scope of employment because of the absence of control and benefit. Driving a required vehicle, however, is a horse of another color because it satisfies the control and benefit elements of *respondeat superior.* An employee who is required to use his or her own vehicle provides an "essential instrumentality" for the performance of the employer's work. *Konradi v. United States,* 919 *F.*2d 1207, 1212 (7th Cir.1990) (finding under Indiana law, employee who drove personal truck to and from work as required "conferred a *benefit* on his employer because he was bringing an essential instrumentality of the employer's business"). When a vehicle must be provided by an employee, the employer benefits by not having to have available an office car and yet possessing a means by which off-site visits can be performed by its employees. It is that benefit that the *Oaks* court overlooked.

*Oaks* was equally wide of the mark regarding control. When an employer requires an employee to use a personal vehicle, it exercises meaningful control over the method of the commute by compelling the employee to foreswear the use of carpooling, walking, public transportation, or just being dropped off at work.

*See Konradi, supra,* 919 *F.*2d at 1211–12 (finding that employer substantially controlled employee's commute because, among other things, employer required employee to use his personal vehicle instead of other forms of commutation (*i.e.,* bus, train, or car pooling)).

On the day in question, Reynolds actually had made an off-site visit in her car and was returning home from the off-site location when the accident occurred. She was required to use her car for the visit. Her commute therefore had a dual purpose insofar as it served interests of both Reynolds and the firm. Moreover, the firm's requirement that Reynolds use her car eliminated alternate means of transportation. Thus, the firm is liable to the Carters under the doctrine of *respondeat superior* because Reynolds' use of her personal automobile to advance her employer's business interests fell within the dual purpose, required-vehicle exception to the going and coming rule and placed her squarely both within the employment relationship and the scope of her employment at the time of the accident. Obviously this is a fact-intensive inquiry. In every case in which a plaintiff invokes the required-vehicle exception to the going and coming rule, he or she must establish that the employer, in fact, required the vehicle to be provided by the employee on the day in question.

## V

■  Although we need not comment on Carter's alternative contention that Reynolds was on a "special errand or mission" for the firm when the accident occurred, we add these observations. The special mission exception has fairly well-defined margins.

When an employee, having identifiable time and space limits on his employment, makes an off-premises journey which would normally not be covered under the usual going and coming rule, the journey may be brought within the course of employment by the fact that the trouble and time of making the journey, or the special inconvenience, hazard, or urgency of making it in the particular circumstances, is itself sufficiently substantial to be viewed as an integral part of the service itself.

[*Carberry v. State, Div. of State Police*, 279 *N.J.Super.* 114, 120, 652 *A.*2d 232 (App.Div.) (quoting 1 Arthur Larson, *The Law of Workmen's Compensation* § 16.11 at 4–204 (1990)), *certif. denied*, 141 *N.J.* 94, 660 *A.*2d 1193 (1995).]

The "special" aspect of the exception requires, at the very least, that the employee perform an act outside the ordinary confines of his or her job description at the behest of the employer. That standard simply does not apply in the circumstances here presented.

## VI

Alternatively, Carter contends that we should adopt the broad enterprise liability theory that is the standard for *respondeat superior* in California. *Hinman, supra,* 88 *Cal.Rptr.* 188, 471 *P.*2d at 990; *Huntsinger, supra,* 99 *Cal.Rptr.* at 668. Enterprise liability is nothing new. It originated outside the law of torts in pure form in the workers' compensation schemes enacted in England and the United States around the turn of the century. Gregory C. Keating, *The Theory of Enterprise Liability and Common Law Strict Liability,* 54 *Vand. L.Rev.* 1285, 1287 (2001); *accord Ricciardi v. Damar Prods. Co.,* 45 *N.J.* 54, 60, 211 *A.*2d 347 (1965) (recognizing underpinning of workers' compensation scheme to be belief that enterprise on behalf of which employee is acting should absorb losses that "inevitably and predictably are an incident of its operations"). However, as scholars have noted, by eliminating the requirement of fault in workers' compensation, the "law of accidents" became a "house divided against itself." *Id.* at 1290. Entirely separate standards governed the same accident, depending on whether an employee or an innocent third party was injured. Thus, according to legal commentators, the birth of workers' compensation was bound to, and in fact did, initiate a revolution in the common law of torts. *Ibid.* (citing Jeremiah Smith, *Sequel to Workmen's Compensation Acts,* 27 *Harv. L.Rev.* 235 (1914)). What occurred was that the enterprise theory expressed in workers' compensation "spread back" into the law of torts as workers' compensation notions were imported into that field. *Id.* at 1287–88 (footnotes omitted). Thus, enterprise liability

informs every *respondeat superior* inquiry to some degree. It is the breadth of the articulation that distinguishes one approach from another.

The California formulation states that the " 'modern and proper basis of vicarious liability of the master is not his control or fault but the risks incident to his enterprise.' " *Huntsinger, supra,* 99 *Cal.Rptr.* at 668 (quoting *Hinman, supra,* 88 *Cal.Rptr.* 188, 471 *P.2d* at 990). In other words, " '[t]he losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business.' " *Ibid.* (quoting *Hinman, supra,* 88 *Cal.Rptr.* 188, 471 *P.2d* at 990 (quotation omitted)). However, we note that when commutation by employees who are required to provide their own vehicles is concerned, the California rule is actually identical to the required-vehicle exception. *See Huntsinger, supra,* 99 *Cal.Rptr.* at 668 (citing *Smith v. Workmen's Comp. Appeals Bd.,* 69 *Cal.2d* 814, 73 *Cal. Rptr.* 253, 447 *P.2d* 365, 373 (1968) (in bank) ("[I]n this day of a highly motorized society we cannot cast the going and coming rule as a protective cloak over the shoulders of the employer, who, for his own advantage, demands that the employee furnish the car on the job.")). It may be that under different facts, consideration of the broader California rationale would be warranted. We see no reason in this case to undertake such a course of action.

## VII

The judgment of the Appellate Division is affirmed.

LaVECCHIA, J., concurring.

I am able to join in the judgment of the Court and its narrow holding that applies the "required-vehicle" exception to the "going-and-coming" rule and imposes liability on this employer under a *respondeat superior* theory. Importantly, the Court eschews any reliance on "the broad enterprise liability theory that is the standard for *respondeat superior* in California." *Ante* at 418,

815 A.2d at 469; *see also O'Toole v. Carr,* 175 N.J. 421, 815 A.2d 471 (2003). The Court wisely declines to adopt a standard that effectively abandons consideration of employer control in the context of employee automobile accidents.

I have no hesitation in agreeing with the Court's assessment here that the employer exercised control and derived benefit from requiring its employee to have her motor vehicle at work that day and sending her, in that vehicle, to an alternate site to perform duties. Her employer thus must bear vicarious liability for the accident that occurred on her way home from that assignment. This was not the employee's typical end-of-workday commute home from her regular worksite; it was a return home from assigned off-site work duties. In that setting, the cessation of workday duties did not signal the end of the employer's control and derived benefit from the condition of employment that required the use of her vehicle in promotion of the employer's interest.

That said, fairly read, the Court's opinion does not stand for the proposition that every invocation of the required-vehicle exception shall subject an employer to liability for an automobile accident occurring during an employee's commutation. It surely has not been, and is not as a result of this decision, the law of this Court that all types of employees who commute to work by personal vehicle, and who may be sent, via their own vehicle, on assignment from time to time, now commute every day to and from their regular workplace "under the control" of their employer. The Court has never considered such a broadly sweeping application of the required-vehicle exception to the going-and-coming rule. The societal cost and benefit of such an across-the-board application of the required-vehicle exception to all employees who may have to commute to work by their own motor vehicle and who may have to use their vehicle occasionally in work-related business would require careful scrutiny, but not today and not on these facts. Because that question is left for another day, I am able to join in the Court's disposition.

*For affirmance*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI and ALBIN—7.

*Opposed*—None.