846 A.2d 1215

SERGIO GALVAO AND ANNA GALVAO, PLAINTIFFS–APPEL-
LANTS, v. G.R. ROBERT CONSTRUCTION COMPANY, DEFEN-
DANT–RESPONDENT AND XYZ COMPANY, 1–100 (A FICTI-
TIOUS NAME), CONRAIL, AND/OR JOHN DOE (A FICTITIOUS
NAME), DEFENDANTS.

Argued February 18, 2004—Decided April 29, 2004.

*Robert G. Hicks,* argued the cause for appellants (*Javerbaum Wurgaft Hicks & Zarin,* attorneys).

*Thomas A. Wester,* argued the cause for respondent (*McDermott & McGee,* attorneys).

Justice LaVECCHIA delivered the opinion of the Court.

In this appeal, we are asked to determine whether a general employer may be held vicariously liable under the doctrine of *respondeat superior* for injuries caused by the alleged negligence of a borrowed, or "special" employee, engaged in the business of a special employer. Nearly a decade ago in a case similar to this one, *Volb v. G.E. Capital Corp.*, 139 *N.J.* 110, 651 *A.*2d 1002 (1995), we observed that two tests had been put forward for use in making such determinations: the control test, which asks whether the general employer controlled the activities of the special employee loaned to the special employer; and the business-furtherance test, which asks whether the activities of the special employee furthered the general employer's business. Our decision in *Volb* left unresolved, however, which test should be applied thereafter. *Id.* at 127–33, 651 *A.*2d at 1011–14. This appeal has furnished the vehicle to end that post-*Volb* uncertainty.

## I.

The facts set forth below have been culled from the detailed and comprehensive findings made by the trial court on the motion for summary judgment of defendant, G.R. Robert Construction Company, Inc. (Robert), the general employer here.

On October 27, 1998, plaintiff, Sergio Galvao,[1] was injured while working on the Route 21 Viaduct Replacement Project in Newark (the Project). Specifically, a rebar cage used for the pouring of concrete failed and plaintiff fell twenty feet onto another rebar cage. Employees of Robert had constructed the defective rebar cage. At the time of the accident, plaintiff's W–2 form listed George Harms Excavating Company (Excavating), an affiliate of

---

[1] By virtue of her *per quod* claim, Galvao's wife Anna also is a plaintiff in this matter. As hereinafter used, the singular "plaintiff" refers to Sergio Galvao and the plural "plaintiffs" refers to both Sergio and Anna Galvao. Conrail, also a named defendant, successfully moved for summary judgment and is not a party to this appeal.

Robert, as the payor of plaintiff's salary. Because the intertwined corporate structure is pertinent to the instant liability issue, the relationships require summarization.

Robert and Excavating are wholly owned subsidiaries of George Harms Construction Company (GHCC) and George Harms is the sole owner of GHCC. Robert and GHCC share the same president, Thomas Hardell.[2] GHCC formed both Robert and Excavating as part of an arrangement that they have referred to as "double breasting."[3] Here, the parent has formed subsidiary companies that are subject to separate collective bargaining agreements based on the service provided by the particular subsidiary and the corresponding union membership of that subsidiary's employees. See *Volb*, 139 *N.J.* at 110, 651 *A.*2d 1002. Robert's employees consisted of members of the United Steelworkers Union, and Excavating's comprised members of the Laborers Union.

Robert and Excavating serve as payroll companies that supply employees to GHCC and receive reimbursement from GHCC for their respective payroll expenses. Those payments are their sole income. Neither can refuse to supply employees to GHCC, nor can either do any business on its own or have any business purpose other than to provide employees to GHCC for work on GHCC's construction projects.

As noted, when plaintiff was injured, GHCC was performing construction and related services on the Project pursuant to a contract (the Contract) with the New Jersey Department of

---

[2] On Robert's motion for summary judgment, in addition to considering the parties' briefs and responses to requests for admission, the trial court heard testimony from only one witness, Mr. Hardell. Mr. Hardell's salary is paid by GHCC.

[3] Strictly defined, the corporate relationships in this matter do not constitute a classic double-breasting arrangement. Double breasting generally refers to a unionized employer that creates or acquires a non-union affiliate. Ben Marsh, *Corporate Shell Games: Use of the Corporate Form to Evade Bargaining Obligations*, 2 *U. Pa. J. Lab. & Emp. L.* 543, 543 (2000). We have used the term loosely, as have the parties.

Transportation (DOT). GHCC and DOT were the only parties to the Contract. Excavating and Robert had not been submitted to DOT as part of the public contract bidding process, and no contract concerning the Project exists between GHCC and either of the subsidiaries.

In respect of the performance of work on the Project, GHCC controlled the direction and supervision of all workers, which necessarily included all employees of Robert and Excavating. Neither Robert nor Excavating assigned any work to the employees on their payrolls. The subsidiaries did not hire or appoint the Project's forepersons, although those supervisors were paid through the subsidiaries' payroll accounts. Moreover, neither Robert nor Excavating had any responsibility for directing or supervising any aspect of the Project or for safety at the job site. Specifically, Robert and its employees did not determine the methods or techniques used in any work aspect of the Project, including the construction of the Project as a whole, the rebar cage in particular, or any other component of the Project. Robert similarly did not supply any construction materials or equipment. In sum, Robert had no purpose on the Project separate and distinct from GHCC, and its sole purpose in that respect was to supply employees to GHCC.

In May 1999, plaintiffs filed this third-party action against Robert, asserting liability under the doctrine of *respondeat superior* for the alleged negligent construction of the rebar cage by Robert's employees. Plaintiffs already had filed a workers' compensation claim against GHCC and received benefits. The trial court dismissed the complaint on Robert's motion for summary judgment. The court held that GHCC, Excavating, and Robert "shared the single purpose of furthering the business interests of [GHCC,]" and "that [GHCC], and no other entity, had exclusive control over [Excavating's and Robert's] employees when [plaintiff's] accident occurred." Therefore, according to the trial court, whether analyzed under the control test or the business-furtherance test, GHCC was solely responsible for the alleged negligence

that caused plaintiff's injury, and therefore no third-party liability should apply to Robert.

In an unpublished opinion, the Appellate Division affirmed substantially for the reasons set forth by the trial court. We granted plaintiffs' petition for certification. 178 *N.J.* 30, 834 *A.*2d 403 (2003).

## II.

### A.

The traditional "essence" of vicarious liability based on *respondeat superior* relies on the concept of employer "control" over an employee. *Wright v. State,* 169 *N.J.* 422, 436, 778 *A.*2d 443, 451 (2001). The employer, having "set the whole thing in motion," should be held "responsible for what has happened." W. Page Keeton et al., *Prosser and Keeton on Torts* § 69, at 500 (5th ed. 1984). Thus, if control over the employee is demonstrated, vicarious liability should attach for an employer because the tort common law interest in deterrence would be furthered: liability would be imposed on the party that is responsible for choosing task methodologies and that is able to alter such task methodologies if they prove injurious. *Id.* at 500–01; *Wright, supra,* 169 *N.J.* at 436, 778 *A.*2d at 451.

More recently, new explanations have emerged for the imposition of vicarious liability. As Professor Prosser has explained, "the modern justification for vicarious liability is a rule of policy, a deliberate allocation of a risk." *Ibid.* That "modern justification" has found acceptance in our State:

> It is now quite generally recognized that the true basis of such vicarious liability is one of policy. As in other cases of strict liability, there is a deliberate allocation of a risk. The losses caused by torts of the servant which are more or less certain to occur in the conduct of the master's enterprise, and are closely connected with it, are placed upon the employer because he is better able to bear them, and to distribute them, through prices, rates or liability insurance, to the public.
>
> [*Eule v. Eule Motor Sales,* 34 *N.J.* 537, 544, 170 *A.*2d 241, 245 (1961) (quoting Prosser, *Torts,* § 62, at 351 (2d ed. 1955)).]

*See also Carter v. Reynolds,* 175 *N.J.* 402, 408, 815 *A.*2d 460, 463 (2003) (noting that "[t]he theoretical underpinning of the doctrine of *respondeat superior* [is] that one who expects to derive a benefit or advantage from an act performed on his behalf by another must answer for any injury that a third person may sustain from it"); *Bd. of Educ. of Piscataway Twp. v. Caffiero,* 86 *N.J.* 308, 319, 431 *A.*2d 799, 804 (1981) (citing W. Prosser, *The Law of Torts,* § 69, at 459 (4th ed. 1971) (finding that "cost spreading principles" underlie "modern application" of "employer's vicarious liability under the doctrine of *respondeat superior*")). Stated otherwise, it is generally understood that in conducting its business, a party may choose to defray the costs of its liability by passing those costs along to consumers, or through the purchase of insurance.

With those principles in mind, we turn to the application of the doctrine of *respondeat superior* in the context of a general employer and its special employee engaged in the business of a special employer. As adverted to earlier, the two most common tests for determining whether a general employer may be held vicariously liable for the negligence of a special employee are the control test and the business-furtherance test. Note, *Borrowed Servants and the Theory of Enterprise Liability,* 76 *Yale L.J.* 807, 811 (1967); Note, *Liability for Torts of Borrowed Servant,* 28 *Ohio St. L.J.* 550, 551–52 (1967). The control test "seeks to place responsibility for the servant's tort upon the employer having the right of control at the time the tortious act occurs. The theoretical basis for the test is the desire to impose liability upon the employer who is in the best position to prevent the injury." Note, *Liability for Torts of Borrowed Servant, supra,* 28 *Ohio St. L.J.* at 552. Under the business-furtherance test, "[t]he crucial issue is whether the employee is furthering the business of the general employer." John E. Skogland, Jr., *Borrowed Servants,* 76 *Com. L.J.* 307, 313 (1971). The rationale for the business-furtherance test is "[t]hat [an] employer who seeks to profit from the acts of the worker should be the one held liable as he will be the one capable of better spreading the loss through higher prices." *Ibid.*

Both tests have been criticized. There has not been a consistent definition of what is meant by the notion of "control." *Devone v. Newark Tidewater Terminal Inc.*, 14 *N.J.Super.* 401, 406–407, 82 *A.*2d 425, 427–27 (1951) (Schettino, J.A.D., concurring). One legal writer has asked: Does control mean "[the] broad control such as the power to discharge the employee, which is usually retained by the general employer, or . . . detailed on the spot control, which is usually exercised by the special employer?" Note, *Liability for Torts of Borrowed Servant, supra,* 28 *Ohio St. L.J.* at 552.

Similar criticism has been launched against the business-furtherance test. Talbot Smith, *Scope of the Business: The Borrowed Servant Problem,* 38 *Mich. L. Rev.* 1222, 1234 (1940) (stating that business-furtherance test "is as bad as the control test. The results are unpredictable, uncertain, and in many cases probably unjust"). Moreover, both tests reason to results that seemingly require exclusive liability for one or the other employer. Note, *Borrowed Servants and the Theory of Enterprise Liability, supra,* 76 *Yale L.J.* at 809, 811; Note, *Liability for Torts of Borrowed Servant, supra,* 28 *Ohio St. L.J.* at 551–52. Requiring exclusivity as an end result has been called unrealistic because "commonly both employers have a measure of control and the business of both is being done." 5 Fowler V. Harper et al., *The Law of Torts* § 26.11, at 68 n. 14 (2d ed. 1986).

Commentary aside, our own caselaw has not produced a conclusive determination as to the appropriate analysis in special employee settings. In the leading case of *Volb, supra,* the plaintiff was the surviving spouse of a special employee who was killed in a workplace accident when he was struck by a truck operated by a T.D.E. employee. 139 *N.J.* at 114, 651 *A.*2d at 1003. At the time of the accident, a T.D.E. affiliate, J.H. Reid General Contractors, Inc. (J.H. Reid), employed the decedent. Both T.D.E. and J.H. Reid were wholly owned subsidiaries of J.H. Reid Construction Company, which had formed the subsidiaries as part of its double-breasting arrangement. As here, the *Volb* plaintiff had filed a

workers' compensation claim against J.H. Reid and had received benefits. *Ibid.* Nonetheless, a majority of this Court held that the plaintiff's successful workers' compensation claim did not bar her separate tort claim against T.D.E., *id.* at 126, 651 *A.*2d at 1010, and we remanded for a determination of whether T.D.E. was liable to the plaintiff under the doctrine of *respondeat superior. Id.* at 132, 651 *A.*2d at 1014.

To assist the trial court in its task, "we review[ed] the pertinent authorities," *id.* at 127, 651 *A.*2d at 1011, and specifically noted the divergent views concerning the appropriate standard for holding a general employer vicariously liable under *respondeat superior* for the alleged negligence of a special employee. *Id.* at 127–29, 651 *A.*2d at 1011–12. We highlighted the traditional "control" test, which " 'is premised on the concept that the master who has control over the servant and derives benefit from the servant should be exclusively liable for the negligent acts of the loaned servant.' " *Id.* at 127–28, 651 *A.*2d at 1011 (quoting *DePratt v. Sergio,* 102 *Wis.*2d 141, 306 *N.W.*2d 62, 64 (1981)). And, we acknowledged that other authorities endorsed a "dual-liability" approach "reflecting the view that because the borrowed servant is engaged in the business of both the general and special employers, both employers could be liable to third parties injured by the borrowed employee's negligence." *Id.* at 128–29, 651 *A.*2d at 1011.

We also recognized that New Jersey cases diverged on the issue. Some decisions that had issued from our Court, or its predecessor, had identified the critical determination as whether there was sufficient evidence to rebut the presumption that the special employee was "performing the business entrusted to him by the general employer." *Volb, supra,* 139 *N.J.* at 129–30, 651 *A.*2d at 1012 (quoting *Larocca v. American Chain & Cable Co.,* 13 *N.J.* 1, 6, 97 *A.*2d 680, 683 (1953) (citations omitted)). Under that line of cases, if a general employer permitted some division of control the presumption would not be rebutted; only a complete surrender of control would suffice. See *Younkers v. County of Ocean,* 130 *N.J.L.* 607, 610, 33 *A.*2d 898, 900 (E. & A.1943) (citing

*Restatement of Agency* § 227, cmt. (b) (1933)). Thus, one or another of the employers would be held liable exclusively.

However, our decision in *Volb* also noted that the reasoning of Justice (then Judge) Schettino's concurring opinion in *Devone v. Newark Tidewater Terminal, Inc.,* 14 *N.J.Super.* 401, 82 *A.*2d 425 (App.Div.1951), had been found persuasive by a number of lower courts. Specifically, Justice Schettino's separate opinion "criticized the 'control' test, advocated [for] the principle of dual liability, and asserted that the general employer should be liable whenever 'the employee's negligence [was] committed while he was acting in furtherance of his general employer's interests.'" *Volb, supra,* 139 *N.J.* at 130, 651 *A.*2d at 1012 (alteration in original) (quoting *Devone, supra,* 14 *N.J.Super.* at 414, 82 *A.*2d at 431–32 (Schettino, J.A.D., concurring)). Several decisions of the Appellate Division had relied on Justice Schettino's concurring opinion in *Devone* in applying both the business-furtherance and dual-liability tests. See *Volb, supra,* 139 *N.J.* at 131–32, 651 *A.*2d at 1013–14 (citing *Martin v. Perth Amboy Gen. Hosp.,* 104 *N.J.Super.* 335, 250 *A.*2d 40 (App.Div.1969); *J.L. Querner Truck Lines, Inc. v. Safeway Truck Lines, Inc.,* 65 *N.J.Super.* 554, 168 *A.*2d 216 (App.Div.), *aff'd,* 35 *N.J.* 564, 174 *A.*2d 201 (1961); *Cross v. Robert E. Lamb, Inc.,* 60 *N.J.Super.* 53, 158 *A.*2d 359 (App.Div.), *certif. denied,* 32 *N.J.* 350, 160 *A.*2d 847 (1960); *Viggiano v. William C. Reppenhagen, Inc.,* 55 *N.J.Super.* 114, 150 *A.*2d 40 (App.Div. 1959)).

## III.

### A.

The inability of this State's courts to agree on the proper standard to apply when determining whether to hold a general employer vicariously liable for the alleged negligence of a special employee reflects the lack of consensus on the topic. We are persuaded that the proper course is not the selection of one test over another, but rather is an approach that synthesizes compo-

nents of both the control and business-furtherance tests. Combining the tests gives due weight to the traditional justification of *respondeat superior* liability, namely "control," *Carter, supra,* 175 *N.J.* at 408, 815 *A.*2d at 463, as well as its "modern justification," *Prosser and Keeton on Torts, supra,* § 69, at 500, namely, the "deliberate allocation of a risk." *Eule, supra,* 34 *N.J.* at 544, 170 *A.*2d at 245.

▇ Thus, the test we adopt for determining whether a general employer (i.e. Robert) may be held vicariously liable for the alleged negligence of its special employee loaned to a special employer (i.e. GHCC) necessarily contains two parts. The threshold inquiry is whether the general employer controlled the special employee. By "control," we mean control in the fundamental *respondeat superior* sense, which was described recently as "the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or in other words, not only what shall be done, but how it shall be done." *Wright, supra,* 169 *N.J.* at 436–37, 778 *A.*2d at 452. In addition to evidence of direct or "on-spot" control "over the means by which the task is accomplished," we will infer an employer's control based on the " 'method of payment[,] who furnishes the equipment, and [the] right of termination.' " *Id.* at 437, 778 *A.*2d at 452 (first alteration in original) (quoting *New Jersey Prop.-Liab. Ins. Guar. Ass'n v. State,* 195 *N.J.Super.* 4, 14, 477 *A.*2d 826, 832 (App.Div.), *certif. denied,* 99 *N.J.* 188, 491 *A.*2d 691 (1984)). The retention of either on-spot, or broad, control by a general employer would satisfy this first prong.

▇ If a general employer is not found to exercise either on-spot, or broad, control over a special employee, then the general employer cannot be held vicariously liable for the alleged negligence of that employee. If the general employer did exercise such control, however, then it must be ascertained whether the special employee furthered the business of the general employer. A special employee is furthering the business of the general employer if "the work being done [by the special employee] is within the

general contemplation of the [general employer,]" *Viggiano, supra*, 55 *N.J.Super.* at 119, 150 *A.2d* at 43, and the general employer derives an economic benefit by loaning its employee. *Ibid. See generally Devone, supra*, 14 *N.J.Super.* at 414, 82 *A.2d* at 431–32 (J. Schettino, concurring) (concluding that "sole inquiry" is whether "the employee's negligence [was] committed while he was acting in furtherance of his general employer's interests"); *ibid.* (opining that liability should not attach where employee loaned as "accommodation of the special employer to perform services in which the general employer has no business interest whatsoever"). If the answer to the second question is in the affirmative, the general employer may be held vicariously liable for the alleged negligence of a special employee.[4]

## B.

█ In this matter, we are confident that plaintiffs cannot satisfy either prong necessary to hold Robert vicariously liable under the doctrine of *respondeat superior.* In respect of the first prong concerning control, the trial court's findings demonstrate that Robert did not have the type of broad influence over the Project from which we might "infer [the] right to control," such as paying plaintiff's salary, furnishing construction materials or equipment for the Project, or retaining the right to hire fore-persons and assign employees to particular aspects of the Project. *Wright, supra*, 169 *N.J.* at 437, 778 *A.2d* at 452. Nor is there is any evidence that Robert had on-spot control of the special employees. Robert did not direct the on-site work, design the rebar cages, or have any responsibility for safety. Thus, under the facts of this matter, Robert did not control the Project or the activities on the Project. For that reason alone, we conclude that

---

[4] The test we posit is but one aspect to the liability analysis. If a plaintiff satisfies the dual test, then the plaintiff must still establish that at the time of the alleged injury, the purportedly negligent employee was acting within the scope of her or his employment. *Carter, supra*, 175 *N.J.* at 409, 410–12, 815 *A.2d* 460 464–66.

Robert cannot be held vicariously liable under *respondeat superior* for plaintiff's injuries.

Although the lack of control ends the inquiry, for completeness we add the following analysis of the second prong. Robert did not derive any economic benefit by providing special employees to GHCC. Robert's only income was reimbursement from GHCC for its payroll expenses, a pass-through transaction. Any benefit derived from the use of Robert's employees on the Project, economic or otherwise, was GHCC's alone. It was GHCC that created Robert and Excavating in a double-breasting or quasi-double-breasting arrangement, and it was GHCC that entered the contract with, and was paid by, DOT for completing the Project. The only beneficiaries of the contract between DOT and GHCC, other than the principals themselves, were the employees who received remuneration for their services. Therefore, as with the control prong, plaintiff failed to meet the business-furtherance prong to demonstrate that Robert may be held vicariously liable for the alleged negligence of the special employees here.

We add, also, that our result is not solely a function of the corporate affiliation between GHCC and Robert, as has been suggested by plaintiff. A general employer not affiliated with the special employer could be relieved of liability under the business-furtherance test if it either "gratuitously" loaned the special employee, *Viggiano, supra,* 55 *N.J.Super.* at 119, 150 *A.*2d at 43, or the special employee engaged in work outside the contemplation of the general employer. In the same vein, an affiliated company could be found liable under this business-furtherance prong if it derived some independent economic benefit from the arrangement. But no such benefit accrued to Robert here.

As a final matter, although the facts do not support dual-liability, we caution that nothing in this opinion should be construed as foreclosing the possibility of dual liability. We recognize that a situation can arise where general and special employers both retain some control over a project and both stand to reap an economic benefit from it. In those circumstances, allocating liabil-

ity between the responsible parties might be appropriate as it would in any matter in which two or more parties are responsible for a plaintiff's injuries.

## IV.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA, ALBIN, and WALLACE—5.

*Opposed*—None.