OPINION OF THE COURT
RENDELL, Circuit Judge.
Siemens Building Technologies, Inc. (“Siemens”) appeals from the June 24, 2005, Order of the District Court granting a motion by PNC Bank (“PNC”) for summary judgment on Siemens’s respondeat superior claim and denying Siemens’s cross-motion for summary judgment on the theory of apparent authority. We ■will affirm the Order of the District Court.[1]
I.
From January of 1996 through March of 1998, Michelle Williams was employed as an assistant in the payroll department of Cerberus Pyrotronies, Inc. in Cedar Hill, New Jersey.[2] During the course of her employment, Williams defrauded Siemens through a check-cashing scheme in which she made out payroll checks to other employees, forged the endorsement signatures of those employees and then cashed the checks for her own gain at PNC Bank. In total, Williams cashed 689 fraudulent checks totaling over $300,000.
In February of 1998, when several Siemens employees complained that their 1997 W2 forms reflected earnings greater *194 than what they had actually received, Williams’s superiors in the payroll department uncovered indications of her wrongdoing and, on March 6, 1998, confronted Williams with their suspicions. Williams admitted that she had defrauded Siemens and was terminated. Siemens subsequently hired the accounting firm KPMG to investigate the extent of Williams’s fraud. In its May 1999 final report on the matter, KPMG notified Siemens of its discovery that Williams had cashed all of the fraudulent checks at one of two local branches of PNC Bank and that the same teller had handled all 639 of the transactions.[3]
After Siemens notified PNC of the results of the KPMG investigation, the Bank identified Eloise Tanner as the teller who had cashed all of Williams’s checks. Tanner held the position of “Head Teller” at PNC and, as such, had the discretion to cash non-customer checks when she had reason to believe they were backed by sufficient funds. When PNC confronted Tanner in January of 2000, she claimed that she did not know Williams and that she had cashed the checks because she believed that PNC had an agreement with Siemens to do so. PNC was unable to locate, and was otherwise unaware of, any such agreement. PNC subsequently dismissed Tanner, though PNC claims that Tanner’s dismissal was prompted by the discovery of a $5,000 shortfall in Tanner’s “reserve vault,” rather than any role she may have played in Williams’s scheme.[4]
In February of 2003, Siemens brought an action against PNC Bank, Williams, Tanner and nine “John Doe” employees of PNC Bank with supervisory powers over Tanner, alleging fraud, negligence, violations of federal and state racketeering statutes and seeking recovery of Siemens’s lost $300,000. Although Siemens’s complaint alleged eight counts, Counts I, II, V, VI, VII and VIII were disposed of early in the litigation and are not before us. Nor is Count IV, which Siemens voluntarily dismissed.
The District Court’s order from which Siemens appeals deals only with Count III: Siemens’s claim that “PNC is vicariously liable to Siemens for the deliberate fraud of its agent, Tanner, under the doctrine of respondeat superior.” PNC moved for summary judgment on this claim, arguing that PNC could not be vicariously liable for fraud because Tanner’s actions were taken outside the scope of her employment. Siemens brought a cross-motion, arguing that “PNC is vicariously liable for Tanner’s wrongful conduct because PNC placed her in the position of head teller which enabled her, cloaked with apparent authority to cash non-customer checks, to commit a fraud upon Siemens.”
The District Court granted PNC’s motion, reasoning that, though “[bjank tellers commonly cash and process checks for customers of a bank; knowingly cashing fraudulent checks is not the same thing” and, therefore, that “Tanner’s acts [were] outside the scope of her employment and the doctrine of respondeat superior, as applied by New Jersey courts, is inapplicable.” It also determined that “no reasonable jury could conclude that Tanner was motivated, in whole or in part, to serve PNC’s interests.” Finally, the District Court also denied Siemens’s cross-motion, holding that because “apparent authority *195 protects only the innocent third party and not all interested parties, PNC is not liable to Siemens for Tanner’s fraudulent conduct under apparent authority.”
Siemens now appeals these rulings of the District Court. We review the District Court’s grant of summary judgment de novo. Robeson Indus. Corp. v. Hartford Accident & Indent. Co., 178 F.3d 160, 164 (3d Cir.1999). Because we sit in diversity, we will apply the substantive law of New Jersey, the forum state in this matter. Id. at 165.
II. — Respondeat Superior
Siemens argues that PNC should be held vicariously liable for Tanner’s fraudulent conduct under the doctrine of respondeat superior.
Under New Jersey law, “an employer can be found liable for the negligence of an employee causing injuries to third parties, if, at the time of the occurrence, the employee was acting within the scope of his or her employment.” Carter v. Reynolds, 175 N.J. 402, 815 A.2d 460, 463 (2003). To succeed in bringing a respondeat superior claim, “a plaintiff must prove (1) that a master-servant relationship existed and (2) that the tortious act of the servant occurred within the scope of that employment.” Id.
In this case, neither side disputes that a master-servant relationship existed between PNC and Tanner. The question here is whether Siemens has offered enough evidence such that a reasonable jury could conclude that Tanner’s acts were within the scope of her employment. “The question whether or not the act done is so different from the act authorized is decided by the court if the answer is indicated; otherwise, it is decided by the jury.” Mason v. Sportsman’s Pub, 305 N.J.Super. 482, 702 A.2d 1301,1310 (1997).
Generally, the phrase “scope of employment” “refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.” Carter, 815 A.2d at 465 (citations omitted). More specifically, “scope of employment is subject to analysis under Restatement [(Second) of Agency] sections 228 and 229,” both of which the New Jersey Supreme Court has explicitly adopted as the guiding principles of this inquiry.[5] Id. Restatement (Second) § 228 reads:
(1) Conduct of a servant is within the scope of employment if, but only if:
(a) it is the kind he is employed to perform;
(b) it occurs substantially within the authorized time and space limits;
(c) it is actuated, at least in part, by a purpose to serve the master; and
*196 (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorize, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.
Additionally, Restatement (Second) § 229 reads:
(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.
(2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:
(a) whether or not the act is one commonly done by such servants;
(b) the time, place and purpose of the act;
(c) the previous relations between master and the servant;
(d) the extent to which the business of the master is apportioned between different servants;
(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
(f) whether or not the master has reason to expect that such an act will be done;
(g) the similarity in quality of the act done to the act authorized;
(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;
(i) the extent to which the departure from the normal method of accomplishing an authorized result; and
(j) whether or not the act is seriously criminal.
Finally, “whether the conduct is intentional or negligent is generally irrelevant.” Cosgrove v. Lawrence, 214 N.J.Super. 670, 520 A.2d 844, 847 (1986). Nor is it determinative that the employee’s tortious conduct violated a specific employer policy. Wright v. Globe Porcelain Co., 72 N.J.Super. 414,179 A.2d 11,14 (1962).
Although the Restatement sections set forth numerous factors for us to consider, we believe the core issue before us to be Tanner’s intent. The District Court determined that “no reasonable jury could conclude that Tanner was motivated, in whole or in part, to serve PNC’s interests.”[6] In approaching this issue, we are mindful that, as Siemens conceded at oral argument, it was Siemens’s burden to show that Tanner was motivated “at least in part, by a purpose to serve” PNC. Carter v. Reynolds, 175 N.J. 402, 815 A.2d 460, 463 (N.J.2003) (holding that “a plaintiff must prove” both the existence of a mas *197 ter-servant relationship and that the employee’s actions were in the scope of employment). Siemens has failed to meet this burden. Siemens did not depose Tanner and, therefore, has not offered any direct statement from her regarding her intentions. Although Siemens has offered evidence indicating that PNC tellers were encouraged to cash non-customer checks in order to build relationships and promote the bank’s image, Siemens has not offered anything to indicate that Tanner was motivated by this policy. Siemens may not satisfy its burden in this case by relying solely on evidence of some hypothetical benefit to PNC generally — it must offer evidence of Tanner’s motivations specifically in this situation. Siemens has simply offered no such evidence.
Siemens argues that we should only examine whether the “act itself’ — here, cashing checks — comes within the scope of Tanner’s employment and that we should disregard the “intent to serve” aspect of the analysis. In making this argument, Siemens relies heavily on Abbamont v. Piscataway Twp. Bd. of Ed., 138 N.J. 405, 650 A.2d 958 (1994), and Hill v. New Jersey Dep’t of Corr. Comm’r, 342 NJ.Super. 273, 776 A.2d 828 (2001). We will forgo a lengthy discussion of Abbamont and Hill here, except to say that, though both cases set forth and describe the respondeat superior framework, neither case discusses, much less repudiates, the “intent to serve” aspect of the doctrine. Therefore, we are not persuaded that these cases reflect any change in New Jersey law regarding respondeat superior.
We have little difficulty in affirming the District Court’s judgment that Siemens has failed to offer enough evidence to suggest that Tanner was acting within the scope of her employment in cashing the checks at issue.
III. — Apparent Authority
Siemens also argues that PNC is liable for Tanner’s fraud under a theory of apparent authority.[7] In fact, PNC’s “apparent authority” argument is an amalgamation of two separate arguments sounding in different sections of the Restatement. We find neither to be persuasive.
Siemens’s first apparent authority argument evokes the doctrine’s traditional notion, which dictates that liability “will be imposed upon the principal in cases ... where the actions of a principal have misled a third party into believing that a relationship of authority existed.” Lobiondo v. O’Callaghan, 357 NJ.Super. 488, 815 A.2d 1013, 1018 (2003) (quoting Rodriguez v. Hudson County Collision Co., 296 NJ.Super. 213, 686 A.2d 776, 780 (1997)). However, it is clear that apparent authority “exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized. Further, the third person must believe the agent to be authorized.” Restatement (Second) of Agency, § 8 cmt. c (1958). Siemens neither articulates clearly how it was “misled” nor identifies the particular act it believed Tanner was authorized to take. Indeed, Siemens fails to deal with the fact that it was Siemens’s own employee who, rather than being *198 “misled,” initiated and perpetrated the fraud.[8]
Siemens’s other “apparent authority” argument relies on § 219(2)(d) of the Restatement (Second) of Agency. Siemens argues that PNC should be held liable for Tanner’s fraud because Tanner “was aided in accomplishing the tort by the existence of the agency relationship.” Siemens cites Gaines v. Bellino, 173 N.J. 301, 801 A.2d 322 (N.J.2002), as supporting the application of this principle to intentionally tortious activity such as Tanner’s. However, Gaines, like similar cases such as Abbamont, Hill and Lehmann v. Toys ‘R’ Us, 132 N.J. 587, 626 A.2d 445 (1993), deals with actions brought under very specific statutory schemes designed to govern sexual harassment and other employment-related claims. While not entirely clear, the New Jersey Supreme Court’s application of § 219(2)(d) in these cases appears to be a discrete effort to realize and effectuate the policies giving rise to those statutory schemes rather than an endorsement of applying § 219(2)(d) to all respondeat superior situations. Indeed, applying § 219(2)(d) to this case would, in effect, strip certain prongs from the “scope of employment” aspect of the respondeat superior test. None of the cases cited by Siemens reflect the New Jersey Supreme Court’s intention to depart so significantly from these well-established principles. We decline to predict that the New Jersey Supreme Court would engage in such a massive shift in the New Jersey law of agency.
For the reasons set forth above, we will affirm the Order of the District Court.

. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

. Cerberus was purchased by Siemens following the events giving rise to this litigation. As the parties have done in brief, we will refer to Williams’s employer as Siemens throughout this Memorandum.

. Siemens did not maintain its payroll account with PNC and, otherwise, was not a customer of PNC. Therefore, Williams would cash the check at PNC and PNC would in turn seek reimbursement from Siemens’s account-holder bank.

. Despite Tanner's claims that she did not know Williams, Tanner's original employment application for her position listed Williams as a reference.

. The New Jersey Supreme Court has not yet adopted the formulation of respondeat superi- or given in the Restatement (Third) of Agency, which was published earlier this year. See Restatement (Third) of Agency § 7.07. For our purposes, the key difference between the Second and Third Restatement is the degree to which the employee must intend his or her actions to be in service of his or her employer before vicarious liability can attach. In the Second Restatement, as noted below, the conduct is not within the scope of employment if it is “too little actuated by a purpose to serve the master.” Restatement (Second) of Agency § 228(2) (1958). However, in the Third Restatement, conduct is not within the scope of employment "when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." Restatement (Third) of Agency § 7.07(2) (1958) (emphasis added). As stated, we will follow the approach set forth in the Second Restatement.

. The District Court also focused on whether Tanner was acting within the scope of her employment and concluded she was not because the act she took, "knowingly cashing fraudulent checks," was “sufficiently different from the act authorized.” We disagree with this approach. Under Restatement (Second) § 229(1), we are to determine whether the act at issue is "of the same general nature as that authorized.” (emphasis added). The plain language of this provision suggests that we should resist defining conduct with reference to the particular facts attendant to that conduct or with reference to any other limiting parameters. Instead, the Restatement makes clear that we should define the relevant act in broad terms. Here, it is more properly said that Williams "cashed checks,” and that this was the conduct authorized by PNC in her role as a teller.

. We note that Siemens did not plead this theory in its complaint, instead raising it for the first time in its brief in support of its cross-motion for summary judgment. The District Court identified this defect but ultimately decided to rule against Siemens on the merits. Although PNC argues that the issue is not properly before us and that we should decline to entertain it, we will follow the lead of the District Court and opine on the merits of Siemens’s argument.

. Related to this argument is Siemens's reliance on Restatement (Second) § 261, which states that a “principal who puts a servant or other agent in a position which enables the agent, while apparently acting within its authority, to commit a fraud upon third persons is subject to liability to such third persons for fraud.” However, the Restatement clearly states that liability under § 261 is premised upon "the fact that the agent’s position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.” Restatement (Second) of Agency § 261 cmt. a (1958). Siemens’s argument is, apparently, that Williams was the “third party” from whose point of view "the transaction seem[ed] regular on its face.” Again, however, it was Williams who created and implemented the scheme and, therefore, it defies all reason to suggest that Williams could have in someway been deceived by Tanner's actions.